UNITED STATES ex rel. James
Michael HARRIS, Relator,

v.

LOCKHEED MARTIN
CORPORATION,
Defendant.

Civil Action No. 1:08–CV–3819–AT.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 9, 2012.

Sally B. Molloy, U.S. Attorney's Office, Atlanta, GA, for Relator United States.

Julie K. Bracker and Mike Bothwell, Bothwell Bracker, P.C., Roswell, GA, Kristofer R. Schleicher, Gicaoma Schleicher, LLC, Atlanta, GA, for Relator James Michael Harris.

Glenn V. Whitaker, Jeffrey A. Miller, Joseph M. Brunner, Victor A. Walton, Jr., Vorys, Sater, Seymour and Pease LLP, Cincinnati, OH, Joshua H. Viau, Stanford Glenn Wilson, Elarbee, Thompson, Sapp & Wilson, LLP, Atlanta, GA, for Defendant.

## *ORDER*

AMY TOTENBERG, District Judge.

This matter is before the Court on Defendant Lockheed Martin Corporation's ("Lockheed") motion to dismiss, [Doc. 56], Relator James Michael Harris' first amended complaint, [Doc. 44]. Relator Harris filed a motion to strike Defendant Lockheed's reply brief, [Doc. 61], and Defendant Lockheed has filed a motion seeking leave to file a surreply, [Doc. 72]. Mr. Harris has sued Defendant Lockheed as a relator in this qui tam action, alleging that Defendant Lockheed fraudulently billed the United States for nearly thirty years for airplane parts Lockheed did not produce, for labor that Lockheed did not expend, and for overpriced materials used in airplanes the United States contracted with Lockheed to build for all branches of the American military.[1] For the reasons

---

1. After the predecessor judge in this case ruled that the Court would grant to the Unit- ed States government no further extensions to

set forth below, the Court denies Defendant Lockheed's motion to dismiss Mr. Harris' complaint, denies Relator Harris' motion to strike Defendant Lockheed Martin's reply brief, and denies Defendant Lockheed Martin's motion to file a surreply.

## I. STANDARD FOR MOTION TO DISMISS

This Court may dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1216 (3d ed. 2002); see also Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). In considering a Rule 12(b)(6) motion, the court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. See Duke v. Cleland, 5 F.3d 1399, 1402 (11th Cir.1993). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitlement' to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955).

"[As] an amended pleading supersedes the former pleading[,] the original pleading is abandoned by the amendment, and [the original pleading] is no longer a part of the pleader's averments against his adversary." Pintando v. Miami–Dade Housing Agency, 501 F.3d 1241, 1243 (11th Cir.2007). Accordingly, the Court here does not assess the viability of Plaintiff's claims based on a comparative analysis of his original and amended complaint, as Defendant urges.

The Court also concludes that it would be improper to consider the web site information that Defendant refers the Court to in its briefing, because in ruling upon a motion to dismiss, "the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." Speaker v. U.S. Department of Health & Human Services, 623 F.3d 1371, 1379 (11th Cir.2010). The web site information Defendant referenced does not meet these standards. Finally, for the same reason, the Court will not consider evidence extrinsic to the Amended Complaint that addresses particularized information regarding the deactivation of specific Lockheed computer systems. For this reason, the Court **DENIES** Defendant's motion for leave to file a surreply, (Doc. 72), and will not delve into the parties' battle over factual disputes that go far beyond the scope of the Amended Complaint.

## II. FACTUAL BACKGROUND

Keeping in mind that at the motion to dismiss stage the Court must construe the allegations in the Amended Complaint in

investigate the claims in this matter, (Doc. 19), the United States filed a notice indicating that it was unable to complete its investigation by the deadline the Court set and therefore could not decide whether to proceed with an action, (Doc. 20). The government's notice stated that it would continue its investigation of Relator's claims, reserved the right to intervene at a later time, and requested to be served with all pleadings throughout the litigation.

the Plaintiff's favor and accept all factual allegations as true, the Court provides the following factual background. Plaintiff Harris worked in the trim department at Defendant Lockheed Martin's manufacturing and assembling facility in Marietta, Georgia for twenty-seven and a half years, ending in March 2007. (First Am. Compl. ¶¶ 6–7.) All or virtually all of his work was on Lockheed's government contracts. (*Id.* at ¶ 118.) As a "trimmer," Plaintiff Harris produced and installed various interior pieces of different airplanes—including carpet, upholstery, insulation, curtains, fabric blankets, coverings for navigational equipment, fire shield blankets, and floor mats—that Lockheed manufactured for the United States military. (*Id.* at ¶¶ 16–17.)

He and other employees in the department with whom he was familiar were responsible on an individual basis for logging the nature and length of their labor in the company's detailed, internal time-tracking software system.[2] The data system allegedly forms the basis for Lockheed's billing of the government for its services. (*Id.* at ¶¶ 32–43, 115–117, 126–129.) During the course of his employment at Lockheed Martin, Mr. Harris observed and was directed by his supervisors to participate in a scheme to defraud the United States of the benefits of its contracts with Lockheed to produce airplanes for the armed forces. (*Id.* at ¶¶ 34–47, 51–52, 54–55, 57–69, 78, 83, 102–03, 113, 115–17, 126–29.)

Lockheed Martin's contracts with the United States involved two types of pricing. "Fixed-price contracts" involve a ne-gotiated fee for the product regardless of the manufacturer's actual costs. (*Id.* at ¶¶ 18–19.) "Cost-plus contracts" involve a fee up to a negotiated ceiling for the product with a fixed fee for costs exceeding the ceiling. (*Id.* at ¶ 20.) Lockheed's contract for the C–130 was a fixed-price contract. (*Id.* at ¶ 22.) The F–22 Raptor fighter jet contract was a cost-plus contract during the initial production phase, but became fixed-price contracts in later production phases. (*Id.* at ¶ 24.) Lockheed's contracts for the C–5 military transport plane, the P–3 Orion fighter jet, spare parts for planes the National Guard bought from other branches of the military, and replacement trim parts for various planes were cost-plus contracts. (*Id.* at ¶¶ 23, 25–26, 29.)

The alleged scam involved supervisors directing employees, including Mr. Harris, to bill time spent on trim pieces for fixed-price contract planes to cost-plus contract planes or to bill for unnecessary trim work, allowing Lockheed to recoup losses or increase profits otherwise prohibited by its government contracts. For example, Lockheed's internal tracking system listed unnecessary tasks and erroneous completion times for various trim parts of the plane. (*Id.* at ¶¶ 32–34, 42.) When employees ran out of billable time on a fixed-price contract plane, they billed additional time spent working on the fixed-price contract plane to an unnecessary task or one with remaining allotted time on a cost-plus contract plane. (*Id.* at ¶¶ 38–40, 42, 44–47.) While Lockheed's internal tracking system revealed evidence of the scheme to

---

**2.** As the Amended Complaint alleges in paragraphs 31 and 32, "The Order Number is the identifier for the electronic file that shows the part number, the contract to be billed, the aircraft, the operational steps to be performed, which employees' time was billed to fulfillment of a certain order, and how much time each employee billed to that file. Tasks are divided into 'operation steps' with labor charged to each step.... Employees then scan their ID cards into the computer in order to inform SFM that they are the person assigned to each task and that the program should start billing for the given task under that person's ID number."

its employees, Lockheed used its system to "roll[ ] all labor hours charged to a project together without telling what specific work was done so that it is impossible to distinguish hours billed fraudulently from those properly billed." (*Id.* at ¶ 116.) Lockheed submitted these consolidated charges in its bills to the government to hide these practices. (*Id.* at ¶ 117.) In submitting these consolidated bills to the United States for payment, Lockheed falsely certified that it was entitled under its contracts to receive the payments it requested. (*Id.* at ¶¶ 88–95.) The company also falsely certified the commercial reasonableness of its charges. (*Id.* at ¶ 96.)

These practices created the appearance that Lockheed was able to meet its obligations under its fixed-price contracts, while concealing increased profits via fraudulent bills for its cost-plus contracts. (*Id.* at ¶¶ 53–54.) But Mr. Harris, with access to the company's internal labor and time management system, observed that Lockheed billed the government for labor in connection with cost-plus contract trim parts at costs several times what those same parts cost under a fixed-price contract due to the company's padded billing scheme. (*Id.* at ¶ 61.) The scheme also laid the foundation for Lockheed to set higher prices for fixed-price contracts based on data from inflated cost-plus contracts. (*Id.* at ¶ 57.)

Beginning in 1998, Mr. Harris complained about the fraudulent billing practices he was observing. (*Id.* at 131.) He complained to colleagues, supervisors, managers, and union officials. (*Id.* at ¶¶ 130–40.) No one made any changes to correct Lockheed's billing practices. In 2006, Mr. Harris injured his knee while working at Lockheed. (*Id.* at ¶ 143.) Af-

ter the injury, the company moved him from a cost-plus project, where he had access to evidence of the billing scheme, to a fixed-price project. (*Id.* at ¶¶ 143–45.) Mr. Harris protested that he could still perform the tasks in his original position, to which the company responded by temporarily moving Mr. Harris to a job away from all documents and billing records. (*Id.* at ¶¶ 146–49.)

In 2007, Mr. Harris wrote a letter requesting a meeting with the Director of Aircraft Operations, Mike O'Brien, for the C–130 plane to discuss Mr. Harris' concerns about Lockheed's billing practices. (*Id.* at ¶¶ 150–52.) An administrator from the Human Resources department attended Mr. Harris' meeting with Mr. O'Brien and "threatened that if Mr. Harris continued to complain about false billing records, it would be grounds for termination." (*Id.* at ¶ 152.) On March 1, 2007, Lockheed suspended Mr. Harris, informing him that the "false allegations" and accusations he had made about billing and "falsification of documents" led to his suspension and ultimately, his termination in late March 2007. (*Id.* at ¶¶ 153–54.)

After having provided the information above to the Air Force Office of Special Investigations and an unspecified United States Attorney's Office, Mr. Harris filed this suit on December 17, 2008. (Doc. 1.) His Amended Complaint alleges False Claims Act violations under 31 U.S.C. § 3729(a)(1)-(2), a conspiracy under the False Claims Act in violation of 31 U.S.C. § 3729(a)(3), and retaliation after Mr. Harris engaged in protected activity under 31 U.S.C. § 3730(h).[3] Defendant Lockheed filed a motion to dismiss Relator Harris' Amended Complaint on numerous grounds detailed below. (Doc. 56.) Relator Harris

---

**3.** In 2009, Congress amended and renumbered sections of the False Claims Act. Fraud Enforcement & Recovery Act of 2009, Pub. L. No. 111–21, 123 Stat. 1617, 1621–22 (2009). These amendments do not apply to this case. *See* 123 Stat. at 1625. Citations herein refer to the False Claims Act before the 2009 amendments.

filed a motion to strike Defendant Lockheed's reply for "blatantly exceed[ing]" page limits for reply briefs under the local rules. (Doc. 61.) Defendant Lockheed filed a motion seeking leave to file a surreply with evidence in response to Relator's notice of supplemental authority. (Doc. 72.) The Court addresses the substance of Defendant Lockheed's motion to dismiss Plaintiff Harris' allegations first. The Court notes additional facts below as needed, keeping in mind the standard for reviewing a motion to dismiss.

## III. DEFENDANT LOCKHEED'S MOTION TO DISMISS

Lockheed has moved to dismiss Relator Harris' complaint on several grounds. First, Lockheed argues that Mr. Harris' claims under the False Claims Act are barred by the Act's first-to-file rule in 31 U.S.C. § 3730(b)(5). Second, Lockheed argues that Mr. Harris' claims under the False Claims Act are barred by the Act's exclusion under 31 U.S.C. § 3730(e)(4) of cases based on facts previously publically disclosed. Third, Lockheed argues that Mr. Harris has failed to plead his claims with particularity under Federal Rule of Civil Procedure 9(b). Fourth, Lockheed argues that Mr. Harris' conspiracy claim fails according to the intracorporate conspiracy doctrine. Fifth, Lockheed argues that Mr. Harris has not pled sufficient facts to show that Lockheed terminated him because he was engaging in protected activity. Finally, Lockheed argues that Mr. Harris' retaliation claim is blocked by the False Claims Act's six-year statute of limitations. The Court addresses each argument in turn.

### A. First–to–File Rule

Lockheed first argues that the first-to-file rule set forth in the False Claims Act bars Mr. Harris from bringing this suit under the Act because another qui tam suit arising from the Marietta, Georgia facility is pending in the Southern District of Ohio against Defendant Lockheed. (Doc. 56–1 at 9–15.) The first-to-file rule states: "When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). To support its argument, Lockheed has submitted as an attachment to its motion to dismiss a copy of the Second Amended and Consolidated Complaint in *Howard v. Lockheed Martin Corp.*, No. 1:99–CV–285 (S.D.Ohio May 13, 2005).

The qui tam relator in the *Howard* case has alleged that at its facility in Marietta, Georgia, Defendant Lockheed made tools used in F–22 Raptor fighter jets and C–130J cargo planes that did not meet the planes' specifications. (Doc. 56–2 at ¶¶ 1–2, 81.) Once built, these tools were used to make and assemble the parts that composed the planes Lockheed built for the government. (*Id.* at ¶¶ 40–41.) The airplane contracts required Lockheed to make the tools within a given, limited tolerance according to the planes' specifications. (*Id.* at ¶ 43.) Lockheed and its outside vendors involved in making these tools routinely made non-conforming tools and failed to inspect the tools for non-conformance. (*Id.* at ¶¶ 69–73.) This practice caused Lockheed workers to have to rework the non-conforming tools, scrap the non-conforming tool and start anew, or use the non-conforming tool in the plane. (*Id.* at ¶ 86.)

Lockheed allegedly charged these extra steps to the government by billing for the scrapped tools and the replacement tools or by charging the government without charging the vendor for the rework. (*Id.* at ¶¶ 116–17, 121.) Lockheed hid these surplus charges from the government. (*Id.* at ¶¶ 251–57, 292, 326, 328–29.) When Lockheed personnel reworked a tool,

Lockheed charged the government for the cost of making a new tool entirely. (*Id.* at ¶ 93.) In many instances, Lockheed did not rework the non-conforming tools at all, sending the military defective aircraft or aircraft that could not readily be repaired with replacement parts while charging the government for conforming parts. (*Id.* at ¶¶ 216–17, 224, 240–48.)

■ Except that the *Howard* case also involves a fraudulent billing scheme Lockheed Martin allegedly perpetrated at its aircraft production facility in Marietta, Georgia against the United States government, the rest of the details of that scheme are entirely different than the details of the scheme that Mr. Harris alleges. *See United States ex rel. Lujan v. Hughes Aircraft Co.,* 243 F.3d 1181, 1189 (9th Cir. 2001) (collecting cases and finding that first-to-file rule "bars later-filed actions alleging the *same material elements of fraud* described in an earlier suit, regardless of whether the allegations incorporate *somewhat* different details") (emphasis added); *Cooper v. Blue Cross & Blue Shield of. Fla., Inc.,* 19 F.3d 562, 567 (11th Cir.1994) ("once one suit has been filed by a relator or by the government, all other suits against the same defendant based on *the same kind of conduct* would be barred") (emphasis added). *See also United States ex rel. Capella v. United Technologies Corp.,* No. 3:94–CV–2063 (EBB), 1999 WL 464536, at *10–11 (D.Conn.1999) (finding that allegations of "false billing depreciation costs on fixed assets in *Drake* did not put the government on notice that the defendants falsely billed insurance costs, as alleged in *Capella*"; collecting cases not barred by first-to-file rule where nature of schemes at issue were different).

The fraudulent tool production alleged in the *Howard* case did not put the government on notice of the type of billing scheme in the trim department that Mr. Harris has alleged. *United States ex rel. Duxbury v. Ortho Biotech Products, L.P.,* 579 F.3d 13, 32 (1st Cir.2009) (collecting cases and observing that the goal behind the first-to-file rule is to promptly alert the government to the essential facts of the fraud alleged). Thus, the Court **DENIES** Defendant Lockheed's motion to dismiss Mr. Harris' complaint on the ground that the first-to-file rule precludes his suit.

### B. Public Disclosure Bar

■ Lockheed next argues that the False Claims Act's bar against suits based on facts already known in the public sphere frustrates Mr. Harris' claims here. The public disclosure bar states:

"No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."

31 U.S.C. § 3730(e)(4)(A) (2008). A person is an "original source" if he "has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (2008).[4] Lockheed's public

---

4. In 2010, Congress amended these provisions in 31 U.S.C. § 3730(e) to broaden the public disclosure bar. These amendments do not apply, however, retroactively. *Graham County Soil and Water Conservation Dist. v.*

*United States ex rel. Wilson,* 559 U.S. 280, 130 S.Ct. 1396, 1400 n. 1, 176 L.Ed.2d 225 (2010) (observing that amendments to the jurisdictional provisions of the False Claims Act do not apply retroactively).

disclosure argument is also based on the prior filing of the *Howard* case. (Doc. 56–1 at 16–20.)

■ Clearly, the filing of the *Howard* case itself is a public disclosure. *McElmurray v. Consolidated Gov't of Augusta–Richmond Co.*, 501 F.3d 1244, 1252 (11th Cir.2007) (observing that documents filed with the court are public disclosures under the False Claims Act). But, the bar operates to preclude only those claims based on the facts publicly disclosed. *Id.; Cooper,* 19 F.3d at 567. As discussed above, apart from the location and company involved, the scheme alleged in the *Howard* case and the one Mr. Harris sets forth here have markedly different bases in fact and origin. Because of these foundational differences, the prior existence of the *Howard* case does not bar under 31 U.S.C. § 3730(e)(4)(A) Mr. Harris' claims.

■ Even if the public disclosure bar applied to Mr. Harris' claims, however, he is an original source under 31 U.S.C. § 3730(e)(4)(B) (2008). Mr. Harris bases his claims on his own observations while an employee for over twenty-seven years in the trim department at Lockheed's Marietta, Georgia facility. He has alleged that supervisors instructed him to engage in the time billing practices in the trim department as he describes in his Amended Complaint. He has alleged that supervisors and managers made it clear to him that he must participate in the scheme or risk losing his job. These allegations sufficiently establish that Mr. Harris had direct and independent knowledge of the facts he asserts. *Cooper,* 19 F.3d at 568 (finding that relator who had worked directly with material forming basis of fraud for three years was an original source.) Thus, the Court **DENIES** Defendant Lockheed's motion to dismiss Plaintiff Harris' claims on the ground that the public disclosure bar precludes his claims.

## C. *Pleading Fraud with Particularity*

■ Lockheed next argues that Mr. Harris has failed to plead his fraud claims with particularity under Federal Rule of Civil Procedure 9(b). Under Rule 9(b), the complaint must set forth facts as to the who, what, when, where, and how of the fraud. *Hopper v. Solvay Pharmaceuticals, Inc.,* 588 F.3d 1318, 1324 (11th Cir. 2009); *United States ex rel. Matheny v. Medco Health Solutions, Inc.,* 671 F.3d 1217, 1222 (11th Cir.2012). In contrast to the particularized standard a complainant must use in alleging the mechanics of the fraud, a complainant may plead the scienter portion of fraud generally. *Id.* at 1224; Fed.R.Civ.P. 9(b) (providing that at the pleading stage, "knowledge, and other conditions of a person's mind may be alleged generally").

■ Defendant contends that Relator's Amended Complaint has not presented particularized factual support for his contention that Defendant actually presented to the government false claims for payment or related supporting records in violation of 31 U.S.C. § 3729(a)(1)-(2). Thus, Defendant argues, that Relator's allegations cannot survive dismissal under the principles of pleading that the Eleventh Circuit set forth in *United States ex rel. Clausen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1308–1312 (11th Cir.2002) and its progeny. *See, e.g., United States ex rel. Atkins v. McInteer,* 470 F.3d 1350 (11th Cir.2006); *Hopper,* 588 F.3d 1318.

In *Clausen,* the Eleventh Circuit held that Rule 9(b)'s particularity requirement applies to both the details of the false claim and the presentment of that claim to the United States for payment. "Rule 9(b)'s directive ... does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were

likely submitted or should have been submitted to the Government.... [A]s with every other facet of a necessary False Claims Act allegation, if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." 290 F.3d at 1311.

The Eleventh Circuit's subsequent cases make clear, however, that a somewhat more flexible, case-by-case approach to *Clausen's* principles may be properly applied where the relator's complaint provides other "indicia of reliability" that support the relator's belief and allegations that the defendant submitted actual fraudulent claims to the government. *See generally Cade v. Progressive Community Healthcare, Inc.*, No. 1:09–CV–3522–WSD, 2011 WL 2837648, at *3–7 (N.D.Ga. July 14, 2011) (Duffey, J.) (collecting and synthesizing Eleventh Circuit qui tam pleading cases). Thus, in *United States ex rel. Walker v. R & F Properties of Lake County, Inc.*, 433 F.3d 1349, 1359–60 (11th Cir. 2005), the court found that the relator nurse practitioner's complaint properly survived dismissal where the plaintiff's allegations were based on her personal employment experience within defendant's medical practice and her conversations with the office administrator regarding the billing procedures at issue. *See also United States ex rel. Matheny*, 671 F.3d at 1230 ("As Defendants recognize, we are more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct."); *Hill v. Morehouse Medical Associates, Inc.*, No. 02–14429, 2003 WL 22019936, at *3, 5 (11th Cir. Aug. 15, 2003) (observing that "Rule 9(b)'s heightened pleading standard may be applied less stringently ... when specific 'factual information [about the fraud] is peculiarly within the defendant's knowledge or control' " and where plaintiff pled sufficient facts as an employee based on her first hand witnessing of the fraudulent conduct to provide "the indicia of reliability that is necessary in a complaint alleging a fraudulent billing scheme"); *Clausen*, 290 F.3d at 1314 n. 25 (recognizing that Rule 9(b) standard may be relaxed in "appropriate circumstances to aid those alleging prolonged multi-act schemes" provided the relator alleges "at least some examples of actual false claims to lay a complete foundation" for the rest of his complaint); *United States ex rel. King v. DSE, Inc.*, No. 8:08–CV–2416–T–23EAJ, 2011 WL 1884012, at *1–3 (M.D.Fla. May 17, 2011) (Merryday, J.) (finding that where relator's knowledge of the falsity of the defendant's certification that defendant's manufactured items complied with contract specifications was based upon his own knowledge and involvement in the manufacturing process, complaint allegations were deemed to afford the requisite reliability to support the relator's False Claims Act claims).[5]

---

**5.** The district court in *King* relied in part on the analysis in *United States ex rel. Lockhart v. General Dynamics Corp.*, 529 F.Supp.2d 1335 (N.D.Fla.2007). The *Lockhart* analysis is also relevant to the posture of Relator's allegations here regarding Defendant's systematic false omissions, nondisclosures, and misrepresentations in the time management system used by Defendant as a basis of its certified billing submissions to the government. "One cannot give the date of an event that did not happen, or identify the person who made a disclosure that was not made. The complaint specifically identifies the tests that were not conducted, and gives precise and credible information on how Mr. Lockhart knows what he alleges. This is sufficient to satisfy Rule 9(b)." *Id.* at 1341. Here, Mr. Harris has identified the specific labor processes for which Defendant submitted billing—when, in fact, these labor processes were not performed. He has also given examples of the labor costs Defendant misapplied to particular cost-plus contracts to minimize Lockheed's absorbing cost overruns

Contrary to Defendant Lockheed's arguments, Mr. Harris' allegations, as described herein, plausibly set forth a fraudulent billing scheme with sufficient particularity based on his lengthy employment experience with Lockheed and his mandated input of labor and time related billing information into Lockheed's time management/billing system. Here, Relator has made factually specific allegations as to the mechanics of Lockheed's alleged fraudulent billing practices in the trim department of its Marietta plant over several decades, providing concrete examples of how these practices were implemented over many years, including during the limitations period. In addition to describing the general scheme outlined at the outset of this Order, Relator's Amended Complaint specifically alleges these examples, among others:

- To support fraudulent claims for reimbursement, management directives were given to Relator to bill his labor time to the wrong contract. These included a directive requiring Relator to bill work for the C–130 plane contract to the C–5 contract in May 2004. (Doc. 44 ¶¶ 43, 47.)

- Routine fraudulent charges were made in connection with the specific labor processes of "mark cutouts per pattern" and "sew binding around cutouts." (*Id.* at ¶¶ 39–40.)

- Donny White and E. Janet Penrod entered fraudulent charges of time on order number 8094999 based on their being required to charge for specifically identified labor processes not actually performed. (*Id.* at ¶¶ 36–38.)

- Lockheed submitted false claims in connection with "master plans" for trim in the original production of air-

craft, when no master patterns were made after June 2006. These false charges included labor time for the creation of master plans for the C–5 cargo blankets, even though no master plans were actually created. (*Id.* at ¶ 51.)

- Lockheed double billed charges for Relator's labor time in producing 36 pieces of carpet in December 2006 for the C–130J plane contract as well as grossly inflated the charge of labor hours for production of carpets in this same time period. (*Id.* at ¶¶ 66–73.)

- Lockheed implemented a practice of charging labor time in records *before* the actual placement of orders for specific carpet replacements or *after* the completion of work on the order in the identified months in 2006. (*Id.* at ¶¶ 76–78.)

- Lockheed submitted claims for payment to the United States government that improperly inflated and inaccurately reflected actual labor charges in connection with the sale of upholstery and trim product produced for the C–130, F–22, and P–3 Orion programs from at least June 1, 2006, to February 15, 2007. (*Id.* at ¶¶ 119, 126.) Similarly, Defendant submitted false claims in this time frame for payment by the government in connection with the sale of part number 3351171–7 (floor covering), for the C–130, F–22, and P–3 Orion programs, and with the sale of part number 3311840–83S (fire shield blanket), for the C–130, F–22, and P–3 Orion programs. (*Id.* at ¶¶ 119, 128–29.)

These allegations provide detailed factual indicia of reliability to plausibly support

occurring with fixed price contracts. Relator's allegation is that the time management and billing systems utilized were designed to make non-detectable (*e.g.,* preclude disclo-

sure) the facts that would contradict Lockheed's certification that the billing was accurate, in conformity with the contracts, and reasonable.

Plaintiff's claim that Lockheed knowingly presented false claims for payment to the United States government and false certifications regarding the records that would be material to approval of payment of these false claims. *See* 31 U.S.C. § 3729(a)(1)-(2). The plausibility of these allegations is further strengthened by Mr. Harris having discussed his concerns regarding the fraudulent time billing practices with management representatives. For instance, Mr. Harris alleges that he was ordered by his own supervisors, Jerry Hales and Johnnie Bryson, to record time he expended on production parts for new planes under fixed price contracts to order numbers for replacement parts reimbursed on a cost-plus basis. (*Id.* at ¶ 54–55, 58.)

Additionally, when Mr. Harris relayed his concerns to his Lockheed supervisors, these management representatives appeared to indicate in their responses an acknowledgement of the billing issues Harris had raised. (*Id.* at ¶¶ 130–54.) For instance, after "[Mr.] Harris raised these concerns with his longtime supervisor, Johnny Bryson[,] Mr. Bryson told Mr. Harris, 'If you are concerned about it, don't do it, but it will get done.'" (*Id.* at ¶ 132.) Mr. Harris plausibly alleges that he understood this conversation to mean that "if he did not personally enter his time fraudulently, someone else would go in and enter the time spent for him, either under his name or their own. Either way, the false charges would be entered." (*Id.*)

Relator has pled sufficient facts of the false claims and use of false records relating to the trim department in Lockheed's Marietta facility to support his claims and to put the Defendant on clear notice of the specific nature and scope of his claims. The plausibility and reliability of Relator's allegations are supported by the concrete examples Relator provided in combination with Relator's allegations of his personal involvement and communications with Lockheed management representatives regarding the time management/billing practices at issue. Thus, the Court **DENIES** Defendant Lockheed's motion to dismiss Mr. Harris' claims for failure to meet Rule 9(b)'s standard for the alleged False Claims Act violations.

## D. *Intracorporate Conspiracy Doctrine*

■ Lockheed next argues that the intracorporate conspiracy doctrine bars Mr. Harris' claim under 31 U.S.C. § 3729. The premise of the intracorporate conspiracy doctrine is that because a corporation is composed of its agents, a corporation cannot conspire with its agents and they cannot conspire amongst themselves as long as they are acting within the scope of their employment. *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir.2000).

■ There is a well-recognized exception to the intracorporate conspiracy doctrine, however, for intracorporate criminal conspiracies under 18 U.S.C. § 371 (prohibiting two or more persons from conspiring to defraud the United States). *McAndrew*, 206 F.3d at 1038–39. This is exactly what Mr. Harris has alleged—that Lockheed Martin conspired through its officers, agents, and employees to defraud the United States. (Doc. 44 ¶¶ 161–62.) These allegations plainly describe conduct that, if true, would be violative of both the civil liability provisions of 31 U.S.C. § 3729(a)[6] and the criminal fraud conspiracy provisions of 18 U.S.C. § 371. Thus, the intracorporate "doctrine cannot shield the same conspiracy, alleging the same criminal wrongdo-

---

**6.** In the pre–2009 amendment version of the False Claims Act, 31 U.S.C. § 3729(a)(3) provided for liability for a person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."

ing, from civil liability." *McAndrew,* 206 F.3d at 1034. Accordingly, the Court **DENIES** Defendant Lockheed's motion to dismiss Mr. Harris' conspiracy claim on the ground that the intracorporate conspiracy doctrine bars it.

### E. Retaliation Claim

Lockheed next argues that Mr. Harris has not sufficiently alleged that he engaged in protected activity or that Lockheed Martin terminated him because of his engagement in a protected activity under 31 U.S.C. § 3730(h) (2008). Section 3730(h) protects any employee who "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against" by his employer because of lawful acts the employee made, "including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section...."

The Eleventh Circuit in *United States ex rel. Sanchez v. Lymphatx, Inc.,* 596 F.3d 1300 (11th Cir.2010), addressed such an argument to dismiss a retaliation claim based on facts very similar to those alleged here. In *Sanchez,* the relator "complained again and again about the unlawful actions of the Defendants" and "told them that they were all incurring significant criminal and civil liability." *Id.* at 1303. The *Sanchez* court compared several cases from other circuits that discussed the general rule that reporting wrongdoing to a supervisor was not sufficient behavior to provide the basis for a retaliation claim under the False Claims Act. *Id.* at 1304. The *Sanchez* court went on to state:

> But those courts have also recognized that an employee may put her employer on notice of possible False Claims Act litigation by making internal reports that alert the employer to fraudulent or illegal conduct. If an employee's actions, as alleged in the complaint, are sufficient to support a reasonable conclusion that the employer could have

feared being reported to the government for fraud or sued in a qui tam action by the employee, then the complaint states a claim for retaliatory discharge under § 3730(h).

*Id.* (internal citations omitted). The relator's assertions of her repeated complaints about her employer's illegal behavior and her subsequent termination "successfully stated a claim for retaliatory discharge under § 3730(h)." *Id.*

 This is exactly the type of reporting that Mr. Harris has alleged. As discussed above in Section III.C., Mr. Harris repeatedly related his concerns about Lockheed fraudulently billing the United States to supervisors and managers. (Doc. 44 ¶¶ 130–54.) During these conversations, according to Mr. Harris' allegations, these supervisors and managers indicated in their responses an acknowledgment of Lockheed's false time management and related billing practices. (*Id.*)

When Mr. Harris injured himself at work, Lockheed took that opportunity to move Mr. Harris to a job where he did not have access to evidence showing the scheme. Moreover, according to Mr. Harris' allegations, a human resources department representative threatened him that if he continued to complain about false billing records, this would be grounds for his termination. (*Id.* at ¶ 153). The Court finds that Mr. Harris' complaints to Lockheed were sufficient to cause it to fear that Mr. Harris would report Lockheed to the government or sue in a qui tam action. Thus, the Court **DENIES** Defendant Lockheed's motion to dismiss Mr. Harris' retaliation claim on the ground that he has failed to sufficiently allege that claim.

### F. Statute of Limitations

#### i. Retaliation Claim

 Lockheed argues that Mr. Harris' retaliation claim is barred by the

False Claims Act's statute of limitations. For all False Claims Act retaliation claims arising before Congress amended the Act in 2009, the most "closely analogous state statute of limitations" governs the appropriate filing period. *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 411, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005). Lockheed argues that O.C.G.A. § 9–3–22, authorizing the recovery of damages and wages for the enforcement of "rights accruing to individuals," provides the most closely analogous state statute of limitations to the federal False Claims Act's retaliation provision. *See United States ex rel. Nichols v. Omni H.C., Inc.*, No. 4:02–CV–66(HL), 2008 WL 906426, at *2 (M.D.Ga. March 31, 2008) (applying the two-year statute of limitations where the plaintiff did not contest the applicability of O.C.G.A. § 9–3–22 as establishing the most closely analogous statute to the federal False Claims Act's retaliation provision). Plaintiff contends, however, that the state False Medicaid Claims Act, effective May 24, 2007, and codified in part in O.C.G.A. § 49–4–168.4–.5, should now be viewed as establishing the most analogous state time limit to the False Claims Act's anti-retaliation provision in 31 U.S.C. § 3730(h). The provisions of this Georgia enactment protect corporate whistleblowers from discrimination or harassment based upon an employee's furtherance of a civil action or investigation under the Georgia False Medicaid Claims Act. O.C.G.A. §§ 49–4–168.4–.5.

The Court finds that § 49–4–168.5 does not provide the most analogous limitations provision in the context of the facts of this case. That provision applies solely to whistleblower protection relief where false Medicaid claims are at stake. The instant case relates to claims of a defense contractor's false time keeping and related billing practices. Accordingly, the two-year statute of limitation provided under § 9–3–22 is the most closely analogous Georgia state statute of limitation.

Lockheed terminated Mr. Harris in March 2007. (Doc. 44 ¶ 154.) Mr. Harris brought this case on December 17, 2008. (Doc. 1.) Mr. Harris' retaliation claim still clearly falls within the two-year statute of limitations. While other adverse actions Defendant took against Mr. Harris may fall outside the statute of limitations, they may be considered relevant evidence in proving his retaliation claim. Thus, the Court **DENIES** Defendant Lockheed's motion to dismiss Mr. Harris' retaliation claim on the basis that it is untimely.

ii. False Claims and Records

▬ Lockheed contends that a six-year statute of limitations under 31 U.S.C. § 3731(b) applies to Relator's other False Claims Act claims because the United States has not intervened in this matter. Based upon the reasoning contained in Chief Judge Carnes' decision in *United States ex rel. Olsen v. Lockheed Martin Corp.*, No. 1:09–cv–3083, slip op. at 12–13 (N.D.Ga. Sept. 17, 2010), the Court concludes that in the current posture of the case, the six-year statute of limitations under 31 U.S.C. § 3731(b)(1) applies here rather than the ten-year provision contained in 31 U.S.C. § 3731(b)(2). *See also United States ex rel. Sanders v. N. Am. Bus. Indus., Inc.*, 546 F.3d 288, 294 (4th Cir.2008) ("Section 3731(b)(2) makes sense only when read to extend the FCA's limitations period in actions brought or joined by the United States."); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 725 (10th Cir. 2006). *But see United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1216 (9th Cir.1996) (observing that tolling provision applicable to United States also applicable to private qui tam plaintiffs where United States has not intervened because private relators stand in the place of the United States government in a qui tam action).

Accordingly, Mr. Harris' claims for conduct prior to December 17, 2002, are time barred. Should the government later intervene in this action, the Court will revisit this determination.

## IV. CONCLUSION

As discussed above, the Court **DENIES** Defendant Lockheed's motion to dismiss or transfer Mr. Harris' qui tam suit. [Doc. 56.] The scope of Plaintiff's claims arising under 31 U.S.C. § 3729(a)(1)-(3) are limited to: (a) claims relating to Defendant's billing submissions and representations to the United States government connected to the trim department of Defendant's Marietta, Georgia facility; and (b) claims for Defendant's conduct arising on or after December 17, 2002. Plaintiff's retaliation claims under 31 U.S.C. § 3730(h) shall be limited to Defendant's actions taken on or after December 17, 2006.

The Court **DENIES** Relator Harris' motion to strike Defendant Lockheed's reply to his response to its motion to dismiss, [Doc. 61], and **DENIES** Defendant Lockheed's motion to file a surreply, [Doc. 72].

It is **SO ORDERED.**